UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

CARMEN McLAUGHLIN,

Plaintiff

v.                                                    Civil Action No.

LOUISIANA-PACIFIC CORPORATION,

Defendant.

COMPLAINT
JURY TRIAL REQUESTED
INJUNCTIVE RELIEF REQUESTED

NOW COMES the Plaintiff, Carmen McLaughlin ("McLaughlin" or "Plaintiff"), by and through her undersigned counsel, and complains against the Defendant, Louisiana-Pacific Corporation ("LP" or "Defendant"), as follows:

## I.    INTRODUCTION

1.  This is an action brought by Plaintiff, Carmen McLaughlin, against Defendant, Louisiana-Pacific Corporation, for unlawful employment practices, including sex discrimination, hostile work environment, and retaliation, in violation of her rights under Title VII of the Civil Rights Act of 1964 ("Title VII"), the Maine Human Rights Act ("MHRA"), and the Maine Whistleblowers' Protection Act ("MWPA").

## II.    PARTIES

2.  Plaintiff is a United States citizen residing in the Town of Oakfield, County of Aroostook, State of Maine.

1

3. Defendant is a global building materials manufacturer. Defendant's Headquarters are located in Nashville, Tennessee, but Defendant maintains administrative locations and manufacturing centers throughout North and South America.

4. Plaintiff worked for Defendant at their siding manufacturing plant located in Houlton, Maine.

5. At all relevant times, Defendant employed more than 4,300 employees.

6. At all relevant times, Defendant was an "employer" within the meaning of Title VII, 42 U.S.C. § 2000e(b), and the Maine Human Rights Act, 5 M.R.S. § 4553(4), and Plaintiff was an "employee" of Defendant within the meaning of those statutes and the Maine Whistleblowers' Protection Act, 26 M.R.S. § 832.

## III.    JURISDICTION AND VENUE

7. This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331, as this action arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

8. This Court has supplemental jurisdiction over Plaintiff's state law claims arising under the Maine Human Rights Act, 5 M.R.S. § 4551 *et seq.*, and the Maine Whistleblowers' Protection Act, 26 M.R.S. § 831 *et seq.*, pursuant to 28 U.S.C. § 1367, as these claims are so related to the federal claims that they form part of the same case or controversy.

9. Venue is proper in the District of Maine pursuant to 28 U.S.C. § 1391(b), as a substantial part of the events giving rise to the claims occurred in Houlton, Maine, and Defendant conducts business in this judicial district.

## IV.    ADMINISTRATIVE EXHAUSTION

10. Plaintiff timely filed a Charge of Discrimination with the Maine Human Rights Commission ("MHRC") and the Equal Employment Opportunity Commission ("EEOC") on October 4, 2024, docketed as MHRC Charge No. E24-0376 and EEOC Charge No. 16B-2025-00015,

2

alleging sex discrimination, hostile work environment, retaliation, retaliatory hostile work environment, and whistleblower retaliation.

11. On May 14, 2026, the MHRC issued Plaintiff a right-to-sue letter with respect to her state law claims and administratively dismissed the Charge pursuant to 5 M.R.S. § 4612(2-A) and § 4612(6).

12. This action is commenced within 90 days of the MHRC's issuance of the right-to-sue letter and is therefore timely under 5 M.R.S. § 4613(2)(C).

13. On or about July 13, 2026, the EEOC issued Plaintiff a Notice of Right to Sue with respect to her federal claims, and this action is commenced within 90 days of Plaintiff's receipt of that Notice.

14. Ms. McLaughlin has exhausted her administrative remedies with respect to all claims set forth in this Complaint requiring administrative exhaustion.

## V.    JURY TRIAL REQUESTED

15. Plaintiff requests a trial by jury for all claims and issues for which a jury is permitted.

## VI.    FACTUAL ALLEGATIONS

16. Plaintiff applied for employment at Louisiana-Pacific Corporation ("LP") near Houlton, Maine in about September 2020 and was offered employment as a temporary employee through the employment agency Manpower.

17. On December 17, 2020, LP offered Plaintiff employment beginning on January 3, 2021, as a Finishing End Operator-Packager in LP's engineered wood products siding manufacturing operation.

18. Throughout Plaintiff's employment, she performed her job duties well and to the satisfaction of her supervisors.

19. On January 3, 2021, Plaintiff began training in the Quality Control Department. She was promoted to a Quality Control Technician I position, then to Quality Control Technician II in 2023.

20. In January 2022 and 2023 Plaintiff received positive annual evaluations from her supervisors.

21. Throughout her employment with LP at their Houlton mill, Plaintiff was one of two women working on the floor of the mill out of approximately 130 employees. At times, Plaintiff was the sole woman in this position.

22. In the first two or three months of Plaintiff's employment, a co-worker wrote a note on a box inside of her locker with sexually harassing language, to the effect of "I want to fuck you so bad."

23. A co-worker took the box to Plaintiff's supervisor, Production Supervisor Andy Savage, who asked Plaintiff what she wanted to do about it.

24. Plaintiff asked Savage to do nothing because she did not want to provoke a hostile reaction from co-workers in her new employment.

25. Savage said he was going to ask LP Human Resources Manager Ryan Bushey to send an email to employees telling them to stay out of other peoples' lockers, however, to Plaintiff's knowledge, no such email was sent.

26. On or about December 13, 2023, Benjamin Dickenson, a Quality Control Tech II on "Crew A," left a message on a work board asserting that Plaintiff was not doing her job properly.

27. Plaintiff's supervisor, Quality Control Manager Cole Richards, and co-worker, Caleb Dicker, told Plaintiff about the message.

28. Plaintiff sent a text message to Benjamin Dickenson saying that she did not appreciate the note he left and that he should not expect her to do him any favors moving forward.

29. Dickenson responded with text messages containing insulting and demeaning comments and referring to Plaintiff by a sexual epithet. Dickenson's messages included comments stating that Plaintiff should be fired, and calling her a "lazy fuck," a "fucking cunt," "a fucking retard to boot" and "fucking retarded lush."

30. Plaintiff responded to Dickenson by claiming that he was angry because she had caught him fudging numbers and adding product to meet specifications and stating that she was going to report what he had said about her to management.

31. Plaintiff knew that Dickenson's comments were illegal sexual harassment prohibited by law.

32. Shortly after Plaintiff left work, manager Richards contacted her and said that Benjamin Dickenson had called him saying that she had harassed him and had provoked a conflict.

33. Plaintiff informed Richards that she had text messages showing exactly what the full conversation was between herself and Dickenson.

34. Plaintiff told Richards that she was done with the hostile treatment, asked to be reassigned to a different department, and then sent Richards the text messages between herself and Dickenson.

35. Within a few days, Plaintiff was called to meet with HR manager Bushey and Richards about the harassment.

36. Bushey went over the text messages between Dickenson and Plaintiff and said that Dickenson and Plaintiff were both rude, that the communication was on Plaintiff's personal phone and so it was not work related, that Plaintiff had provoked the incident, and that he was not going to do anything other than have a conversation with Dickenson similar to the one he was having with Plaintiff.

37. Plaintiff was so angry and upset that LP management was doing nothing about the hostile and discriminatory treatment and sexual harassment she was experiencing that she burst into tears and walked out of Bushey's office.

38. Plaintiff reviewed LP's policies on discrimination, sexual harassment, and retaliation and concluded that HR manager Bushey was not following those policies, especially because no discipline was imposed on Dickenson for sexually harassing her.

39. Plaintiff was aware that LP fired another employee, Chuck Jones, for calling the female warehouse supervisor, Cheryl, the same sexual epithet that Dickenson had called Plaintiff (namely, a "cunt").

40. Plaintiff believed the same discipline should have been imposed on Dickenson based on her report and proof of his use of that slur against her.

41. After Plaintiff reported Dickenson's sexual harassment to LP management, she began to experience hostile reactions from other employees at the mill.

42. Plaintiff was told by a coworker that some other members of Crew A whispered a sexual epithet under their breath when passing by her.

43. On or about December 18, 2023, Plaintiff told manager Richards that Dickenson was leaving messes at work for her to clean up.

44. Plaintiff expressed a belief that this was retaliation for her complaint about him and objected to the treatment she was experiencing.

45. On December 19, 2023, Richards followed up and asked Plaintiff if Dickenson had left another large mess.

46. Plaintiff responded that she did not want to say anything because she feared it would come back on her.

47. Near the end of December 2023, Richards again spoke to Plaintiff about Dickenson's conduct.

48. Plaintiff informed Richards that she was not going to go back to HR manager Bushey because he had not handled Dickenson's conduct properly the first time, because Bushey had no respect for Plaintiff, and because Bushey was not following LP's policies.

49. Richards responded that this was fine.

50. On December 30, 2023, Plaintiff sent a text message to Richards stating that she was tired of being retaliated against by Dickenson.

51. Plaintiff complained that she was having to clean up after Dickenson like he was a child and that he had left Plaintiff with no charged radios which interfered with her ability to do her job until she was able to find another radio elsewhere.

52. Plaintiff stated that she was not the rat, she was not harassing Dickenson, she had not provoked the conflict, and she did not deserve Dickenson's ongoing hostile treatment.

53. Richards spoke to Plaintiff and apologized for Dickenson's conduct.

54. However, to the best of Plaintiff's knowledge, Richards did not address Dickenson's conduct directly.

55. LP imposed no discipline on Dickenson for his sexually harassing conduct toward Plaintiff; at most, LP claims that it "counseled" him.

56. Dickenson submitted a two-week notice of resignation on or about December 30, 2023, and his employment with LP ended on January 18, 2024. On information and belief, Dickenson resigned because LP was unable to transfer him to another shift, not because of any disciplinary action arising from his harassment of Plaintiff.

57. Plaintiff was very upset and demoralized by the ongoing hostile treatment she was experiencing at LP. She felt that she had no help from Bushey and the Houlton LP management.

58. On January 10, 2024, Plaintiff wrote an email to Kaycee Casteel (HR Director in LP's corporate office and HR manager Bushey's superior) stating that she wanted to talk with someone about a matter at work without getting fired or retaliated against but that she did not know who to contact at LP.

59. Plaintiff sent this email from her personal email account and received no response.

60. Plaintiff's reports to HR and her supervisor complied with LP's policies, which stated: "If you believe that you have experienced harassment or discrimination in any form or are aware of the harassment or discrimination of others, you have a duty to immediately report this to your supervisor, your manager, or the Human Resources Department."

61. On April 24, 2024, while Plaintiff was working the night shift, coworker Rick Savoy told her that the ink jets were not printing the bar codes onto the boards properly and asked for Plaintiff's help fixing the problem.

62. There were no safety operating protocols in place for changing ink jets.

63. LP has a policy that if an employee needs to work on energized equipment, they should switch off the breaker to that piece of equipment and place a lock on it so that the equipment does not turn on while the employee is repairing it. This policy is called "lock out tag out" or "LOTO" for short.

64. There were yellow safety bars around the facility that employees were not supposed to pass without following LOTO procedure.

65. It was a routine practice for employees not to stop the machinery in order to follow LOTO procedure. Instead, employees routinely crossed yellow safety bars several times a shift to work on issues with the line.

66. It was normal and routine for employees to cross the yellow safety bars without following LOTO for minor repairs such as replacing ink jet cartridges.

67. To the best of Plaintiff's understanding, it was routine and acceptable to make this repair without following LOTO protocol.

68. As Plaintiff and other employees had routinely done for the past 2 years, Plaintiff climbed under the line, crossing the yellow bars, while Rick Savoy reached over the top of the line, also crossing the yellow bars, and threw her the ink jet cartridges. Plaintiff then switched the ink jet cartridges out.

69. Shortly after, supervisor Scott Kimball told Plaintiff that coworker Derek wanted her fired for not following the lock out tag out ("LOTO") procedure.

70. Plaintiff contacted shift supervisor Kirby Sanford to explain what she had done. Plaintiff informed him that Derek wanted her to be fired for not using LOTO.

71. Sanford said the issue was going to be investigated and sent Plaintiff home from work.

72. Plaintiff was not permitted to work from April 24 until Monday, April 29.

73. On Friday, April 26, HR Manager Ryan Bushey called Plaintiff to inform her that she was still under investigation but would be paid for her time out of work.

74. On Tuesday April 30, 2024, manager Richards called Plaintiff into a meeting with himself and Kirby Sanford.

75. Richards read Plaintiff a termination letter and stated that she should address any issues with HR manager Bushey.

76. The stated reason for Plaintiff's termination was her alleged violation of LP's LOTO procedure during the April 24, 2024 ink cartridge repair, which LP characterizes as a violation of a "Life Saving Rule."

77. That same day, Plaintiff called Bushey and asked why she was being terminated.

78. Plaintiff explained that many other employees, who were all males, had done the same thing as she had but were only disciplined with suspensions and were not fired.

79. Bushey responded that he would not discuss any other employees with Plaintiff.

80. Rick Savoy, the male coworker who initiated the April 24, 2024 ink cartridge repair, engaged in the same conduct for which Plaintiff was terminated: he crossed the same yellow safety bars without following LOTO, reaching over the top of the operating line, and throwing Plaintiff the ink jet cartridges.

81. LP did not terminate Savoy. Instead, LP issued Savoy a three-day unpaid suspension (April 30 through May 2, 2024) and returned him to work on May 3, 2024.

82. During LP's investigation of the April 24, 2024 incident, Savoy admitted to LP that he had performed this same ink cartridge task several times in the past, sometimes locked out and sometimes not locked out.

83. On information and belief, LP never disciplined Savoy for any of his prior performances of the same task without following LOTO.

84. Derek Winton, the male coworker who reported Plaintiff, was also disciplined in connection with the same April 24, 2024 incident. Winton likewise received only a three-day unpaid suspension (April 30 through May 2, 2024).

85. Plaintiff, the only woman involved in the April 24, 2024 incident, was the only employee whose employment LP terminated.

10

86. LP has attempted to distinguish Plaintiff's conduct from Savoy's on the ground that Plaintiff went under the production line while Savoy claims that, when he performed the task without locking out, he reached the cartridges from the side of the line. LP has admitted, however, that during the April 24, 2024 incident Savoy reached over the top of the operating line, crossing the yellow safety bars, without following LOTO. Both employees crossed the same yellow safety bars without following LOTO, and both violated the same LOTO rule that LP cites as the reason for Plaintiff's termination. LP's distinction is a post hoc rationalization for its disparate treatment of Plaintiff.

87. Later in the day on April 30, 2024, Plaintiff emailed LP Plant Manager Nathan Whitney and objected to her termination. Whitney stated he would call Plaintiff back but never did.

88. Plaintiff also emailed LP corporate HR manager Mark Fugelsang to object to being terminated and to report that she was not being treated equally to other employees.

89. A woman in HR called Plaintiff and said that she would investigate her complaint and then call her back, but Plaintiff never heard from this woman again.

90. Defendant discriminated against Plaintiff on the basis of sex by allowing other employees to harass her because of her sex and by failing to take reasonable measures to stop the harassment once Plaintiff reported it.

91. Defendant discriminated against Plaintiff because of her sex and retaliated against her for reporting sex harassment and retaliatory harassment by ignoring her complaints and then terminating her for an alleged infraction that many male employees had committed without receiving discipline.

92. Defendant retaliated against Plaintiff by terminating her employment because she reported and opposed illegal sexual harassment and retaliation.

11

93. The acts of sex-based harassment described above, from the sexually explicit note placed in Plaintiff's locker in early 2021 through the harassment and hostile treatment that continued into 2024, were part of a single, continuing hostile work environment based on Plaintiff's sex.

94. At least one act contributing to that hostile work environment occurred within 300 days of the filing of Plaintiff's Charge of Discrimination and within the limitations period applicable to her MHRA claims. The hostile work environment is therefore actionable in its entirety.

## COUNT I: MHRA – SEX DISCRIMINATION

### (Violation of the Maine Human Rights Act – 5 M.R.S. § 4572(1)(A))

95. Paragraphs 1 through 94 are incorporated by reference.

96. Plaintiff Carmen McLaughlin is a member of a protected class on the basis of her sex (female).

97. Plaintiff was employed by Defendant Louisiana-Pacific Corporation and performed her job duties in a satisfactory manner.

98. During the course of her employment, Plaintiff was subjected to unwelcome conduct motivated by her sex, including:

   a. Harassing behavior and disparaging, sex-based comments from coworkers;

   b. Disparate treatment that included being disciplined and terminated for actions that her male counterparts were not disciplined for; and

   c. Retaliatory comments and conduct after Plaintiff objected to this treatment.

99. The conduct was based on Plaintiff's sex, was unwelcome, and was sufficiently severe or pervasive to create a hostile work environment.

100. Plaintiff reported the harassment to the appropriate people, but Defendant failed to take prompt or effective remedial action.

101. Defendant acted with malice or with reckless indifference to Plaintiff's rights protected by the Maine Human Rights Act.

102. As a direct and proximate result of Defendant's actions and inactions, Plaintiff suffered emotional distress, humiliation, loss of income, and other damages.

### COUNT II: MHRA – HOSTILE WORK ENVIRONMENT (SEX)

### (Violation of the Maine Human Rights Act – 5 M.R.S. § 4572(1))

103. Paragraphs 1 through 102 are incorporated by reference.

104. Plaintiff Carmen McLaughlin is a member of a protected class on the basis of her sex (female).

105. Throughout her employment at Defendant's Houlton mill, Plaintiff was one of two women, and at times the sole woman, working on the floor out of approximately 130 employees.

106. During her employment, Plaintiff was subjected to unwelcome conduct based on her sex, including but not limited to: a co-worker placing a sexually explicit note inside her locker stating words to the effect of "I want to fuck you so bad"; co-worker Benjamin Dickenson directing sex-based slurs and insults at Plaintiff, including calling her a "fucking cunt," a "lazy fuck," "a fucking retard," and a "fucking retarded lush"; co-workers on Crew A whispering a sexual epithet as they passed Plaintiff in the workplace; and the ongoing hostile treatment described in the foregoing paragraphs.

107. The conduct was unwelcome.

108.    The conduct was sufficiently severe or pervasive to alter the conditions of Plaintiff's employment and to create a working environment that was objectively and subjectively hostile and abusive to Plaintiff as a woman.

109.    Defendant knew or should have known of the harassment, as Plaintiff reported the harassment to Production Supervisor Andy Savage, Quality Control Manager Cole Richards, and HR Manager Ryan Bushey, and attempted to escalate her complaint to Defendant's corporate HR Director, Kaycee Casteel.

110.    Despite having knowledge of the harassment, Defendant failed to take prompt, effective, or any meaningful remedial action reasonably calculated to end the harassment.

111.    Defendant's conduct constitutes an unlawful hostile work environment on the basis of sex in violation of the Maine Human Rights Act.

112.    Defendant acted with malice or with reckless indifference to Plaintiff's rights protected by the Maine Human Rights Act.

113.    As a direct and proximate result of Defendant's conduct, Plaintiff has suffered damages including emotional distress, mental anguish, humiliation, reputational harm, lost wages, and loss of employment benefits.

**COUNT III: TITLE VII – SEX DISCRIMINATION (DISPARATE TREATMENT)**

**(Violation of Title VII of the Civil Rights Act of 1964 – 42 U.S.C. § 2000e-2(a)(1))**

114.    Paragraphs 1 through 113 are incorporated by reference.

115.    Plaintiff is a member of a protected class on the basis of her sex (female).

116.    Plaintiff was qualified for her position and performed her job duties satisfactorily, as reflected in her promotions to Quality Control Technician I and II and her positive annual performance evaluations.

14

117.    Defendant terminated Plaintiff's employment on April 30, 2024, citing her alleged violation of the LOTO procedure.

118.    Defendant treated similarly situated male employees more favorably. Rick Savoy, who crossed the same yellow safety bars in the same April 24, 2024 incident and admitted to previously performing the same task without following LOTO, received only a three-day suspension. Derek Winton, who was disciplined in connection with the same incident, also received only a three-day suspension. Plaintiff, the only woman involved, was the only employee terminated.

119.    Defendant's stated reason for terminating Plaintiff's employment was a pretext for discrimination because of sex.

120.    Defendant's conduct constitutes unlawful discrimination because of sex in violation of Title VII, 42 U.S.C. § 2000e-2(a)(1).

121.    Defendant acted with malice or with reckless indifference to Plaintiff's rights protected by Title VII.

122.    As a direct and proximate result of Defendant's conduct, Plaintiff has suffered damages including lost wages and benefits, emotional distress, mental anguish, humiliation, and reputational harm.

### COUNT IV: TITLE VII – HOSTILE WORK ENVIRONMENT (SEX)
### (Violation of Title VII of the Civil Rights Act of 1964 – 42 U.S.C. § 2000e-2(a))

123.    Paragraphs 1 through 122 are incorporated by reference.

124.    Plaintiff is a member of a protected class on the basis of her sex (female).

125.    During her employment, Plaintiff was subjected to unwelcome conduct based on her sex, as described in the foregoing paragraphs, including sexually explicit written content placed in

her personal locker, sex-based slurs and insults from a co-worker, and a pattern of sex-based epithets from members of Crew A.

126. The conduct was unwelcome.

127. The conduct was sufficiently severe or pervasive to alter the conditions of Plaintiff's employment and to create an objectively and subjectively hostile or abusive working environment.

128. Defendant knew or should have known of the harassment through Plaintiff's repeated reports to her supervisors and to Human Resources, and through her written complaint directed to Defendant's corporate HR office.

129. Defendant failed to take prompt and appropriate corrective action to end the harassment.

130. Defendant's conduct constitutes an unlawful hostile work environment on the basis of sex in violation of Title VII.

131. Defendant acted with malice or with reckless indifference to Plaintiff's rights protected by Title VII.

132. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered damages including emotional distress, mental anguish, humiliation, reputational harm, lost wages, and loss of employment benefits.

## COUNT V: MHRA – RETALIATION

### (Violation of the Maine Human Rights Act – 5 M.R.S. § 4633(1))

133. Paragraphs 1 through 132 are incorporated by reference.

134. Plaintiff engaged in protected activity under the MHRA by reporting sex discrimination, retaliation, and a hostile work environment.

16

135. Plaintiff made complaints to her supervisors and to corporate HR both verbally and in writing.

136. Shortly after engaging in protected activity, Plaintiff experienced increased harassment and retaliation from coworkers.

137. The retaliatory harassment Plaintiff experienced after her complaints, including coworkers treating her as a "rat," whispering sexual epithets as she passed, leaving messes for her to clean up, and depriving her of the charged radios she needed to perform her job, was sufficiently severe or pervasive to constitute a retaliatory hostile work environment.

138. Defendant knew of the retaliatory harassment through Plaintiff's reports to manager Richards and her January 10, 2024 email to corporate HR Director Kaycee Casteel, and failed to take prompt or effective action to stop it.

139. The adverse actions to which Defendant subjected Plaintiff include the retaliatory hostile work environment and the termination of her employment.

140. Plaintiff was eventually terminated for a pretextual reason, namely failing to follow "lock out tag out" regulations.

141. Plaintiff's male coworkers have committed the exact same alleged safety violations without being terminated.

142. The timing and context support a causal connection between Plaintiff's protected activity and the adverse employment actions.

143. Defendant's stated reasons for termination were pretextual.

144. Defendant's conduct constitutes unlawful retaliation under the MHRA.

145. Defendant acted with malice or with reckless indifference to Plaintiff's rights protected by the Maine Human Rights Act.

146. As a direct and proximate result of Defendant's retaliation, Plaintiff has suffered damages including lost wages and benefits, emotional distress, mental anguish, humiliation, and reputational harm.

## COUNT VI: TITLE VII – RETALIATION

### (Violation of Title VII of the Civil Rights Act of 1964 – 42 U.S.C. § 2000e-3(a))

147. Paragraphs 1 through 146 are incorporated by reference.

148. Plaintiff engaged in protected activity under Title VII by:

   a. Opposing unlawful employment practices, including sex discrimination in the workplace;

   b. Reporting harassment based on sex by coworkers and supervisors to her supervisors; and

   c. Submitting a written complaint to Defendant's corporate HR office.

149. Plaintiff's complaints and opposition to discrimination constitute protected activity under 42 U.S.C. § 2000e-3(a).

150. Following these protected activities, Defendant subjected Plaintiff to adverse employment actions, including a retaliatory hostile work environment that Defendant knew of and failed to remedy, and the termination of her employment.

151. The adverse actions occurred under circumstances that give rise to an inference of retaliatory motive. The temporal proximity between Plaintiff's protected activity and the adverse actions further supports a causal connection.

152. Defendant's stated reasons for Plaintiff's termination—alleged safety violations—are pretextual. Plaintiff asserts that similarly situated employees were not terminated for the same or comparable conduct.

153.    Defendant acted with malice or with reckless indifference to Plaintiff's rights protected by Title VII.

154.    As a direct and proximate result of Defendant's unlawful retaliation, Plaintiff has suffered and continues to suffer damages, including emotional distress, reputational harm, lost wages, and loss of benefits.

## COUNT VII: MWPA – WHISTLEBLOWER RETALIATION

### (Violation of the Maine Whistleblowers' Protection Act – 26 M.R.S. § 833(1))

155.    Paragraphs 1 through 154 are incorporated by reference.

156.    Plaintiff reported in good faith what she reasonably believed to be unlawful conduct, including sex discrimination, to her employer.

157.    Plaintiff also reported in good faith to her supervisor, Cole Richards, by forwarding him the December 13, 2023 text message exchange, what she reasonably believed to be Dickenson's falsification of quality control data, namely fudging numbers and adding product to meet specifications.

158.    Plaintiff's communications and complaints constitute protected activity under the Maine Whistleblowers' Protection Act.

159.    Defendant subjected Plaintiff to adverse employment actions, including the termination of her employment, as a direct and proximate result of her protected disclosures.

160.    The reasons provided by Defendant were pretextual and not the true motivation for its actions.

161.    Defendant's conduct violates the Maine Whistleblowers' Protection Act.

162. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered damages including lost wages and benefits, emotional distress, mental anguish, humiliation, and reputational harm.

PRAYER FOR RELIEF

Plaintiff respectfully requests that the Court grant the following relief:

A. Declare the conduct engaged in by Defendant to be in violation of her rights;

B. Enjoin Defendant, its agents, successors, employees, and those acting in concert with it from continuing to violate her rights;

C. Order Defendant to reinstate Plaintiff or award front pay to Plaintiff;

D. Award lost future earnings to compensate Plaintiff for the diminution in expected earnings caused by Defendant's discrimination;

E. Award equitable relief for back pay, benefits and prejudgment interest;

F. Award compensatory damages in an amount to be determined at trial;

G. Award punitive damages in an amount to be determined at trial;

H. Award nominal damages;

I. Award attorneys' fees, including legal expenses, and costs;

J. Award prejudgment interest;

K. Permanently enjoin Defendant from engaging in any employment practices which discriminate on the basis of sex or retaliation;

L. Require Defendant to mail a letter to all employees notifying them of the verdict against it and stating that Defendant will not tolerate discrimination or retaliation in the future;

M. Require that Defendant post a notice in all of its workplaces of the verdict and a copy of the Court's order for injunctive relief;

20

N.      Require that Defendant train all management level employees on the protections afforded by the MHRA, MWPA, and Title VII;

O.      Require that Defendant place a document in Plaintiff's personnel file which explains that Defendant unlawfully terminated her because of discrimination and retaliation; and

P.      Grant to Plaintiff such other and further relief as may be just and proper.


Dated:  July 14, 2026                    /s/ Martin P. Tartre
                                         Martin P. Tartre
                                         Attorney for the Plaintiff

                                         EMPLOYEE RIGHTS GROUP
                                         92 Exchange Street 2nd floor
                                         Portland, Maine 04101
                                         Tel. (207) 874-0905
                                         Martin@EmployeeRightsLaw.Attorney